## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

MELISSA S.,
    *Plaintiff,*

    v.

MARTIN O'MALLEY, Commissioner of
Social Security Administration,
    *Defendant.*

No. 3:23-cv-859 (JAM)

### ORDER GRANTING PLAINTIFF'S MOTION TO REMAND
### AND DENYING COMMISSIONER'S CROSS-MOTION TO AFFIRM

Plaintiff Melissa S. claims that she is disabled and unable to work. She applied for disability insurance benefits under the Social Security Act. An Administrative Law Judge ("ALJ") denied her application, and the plaintiff now moves to reverse or remand that decision. The Commissioner has cross-moved to affirm.

For the reasons discussed below, I will grant the plaintiff's motion to remand and deny the Commissioner's motion to affirm. Although I am not persuaded by the plaintiff's claim that the ALJ erred by not concluding that her Huntington's Disease was a severe impairment, I will remand because the ALJ erred in concluding that the plaintiff could perform work at all exertional levels and because this error was not harmless.

### BACKGROUND

The plaintiff was employed as an accounting clerk until 2013, when she left her job to care for her oldest child.[1] Her date last insured was December 31, 2018.[2] The plaintiff suffers

---

[1] Doc. #17 at 39, 245, 330. Record citations in this ruling are to the official transcript filed by the Commissioner (Doc. #17) and to ECF page references that are plus-four pages different from the official transcript and that are identical to the text-searchable transcript separately filed by the Commissioner (Doc. #18-1).
[2] *Id.* at 102.

from Huntington's Disease, a fatal neurodegenerative disorder.[3] She was diagnosed with the genetic abnormality that causes Huntington's Disease in March 2018.[4]

The plaintiff had a series of medical visits in the months preceding and following her diagnosis of Huntington's Disease genetics. She reported a variety of symptoms during these visits, some of which her doctors attributed (at least in part) to Huntington's Disease. These included balance problems, an inability to hold onto objects, and irritability.[5] They may also have included cognitive issues—one of the plaintiff's treatment providers (APRN Robin Zingales-Browne) opined that by the end of 2018, the plaintiff was "unable to work outside the home" because of these cognitive limitations.[6]

Yet the record also contains evidence suggesting that the plaintiff's Huntington's Disease was manageable as of her date last insured. For example, APRN Zingales-Browne noted that the plaintiff was "not overly bothered" by her physical Huntington's Disease symptoms in 2018, and that she was "able to speak intelligently with only subtle signs of HD."[7] Likewise, the plaintiff had a normal brain MRI in February 2018 and described her physical symptoms as "mild" and "not bothersome" in June 2018.[8] Records from her psychiatrist further "indicated that [the plaintiff] did not need treatment of HD symptoms" in May 2019.[9]  And even though she was offered a prescription for Huntington's Disease medication in July 2019, the plaintiff elected to delay taking it.[10]

---

[3] *Id.* at 22.
[4] *See, e.g.*, *id.* at 380.
[5] *Id.* at 34-35, 324-25, 364, 457, 545, 684, 753, 768.
[6] *Id.* at 23. This statement was not presented to the ALJ. *Id.* at 6.
[7] *Id.* at 23.
[8] *Id.* at 31 (ALJ's ruling, citing part of the record).
[9] *Id.* at 32 (ALJ's ruling, citing part of the record)
[10] *Ibid.*

Huntington's Disease was not the plaintiff's only medical concern. During those same 2018 medical visits, the plaintiff also sought treatment for several psychiatric conditions, including post-traumatic stress disorder, obsessive compulsive disorder, major depressive disorder, panic disorder, and anxiety.[11] These conditions caused symptoms such as intrusive thoughts, fatigue, flashbacks, and a depressed mood.[12]

The plaintiff filed her application for benefits in May 2021.[13] After an initial denial, she requested and received a hearing before an ALJ.[14] Working through the sequential process for evaluating a Title II application, the ALJ made the following determinations: (1) the plaintiff did not engage in any gainful activity between her date of alleged onset (March 7, 2018) and her date last insured (December 31, 2018); (2) the plaintiff's psychiatric conditions (specifically PTSD, anxiety disorder, neurocognitive disorder, and depressive disorder) were severe impairments, but her Huntington's Disease was a non-severe impairment;[15] (3) the plaintiff's impairments did not meet or equal the severity of the specified impairments in the Listing of Impairments; (4) the plaintiff could not perform her past relevant work as an accounting clerk in light of the impairments; and (5) the plaintiff had a residual functional capacity to perform work at all exertional levels with several non-exertional limitations.[16]

Lastly, the ALJ concluded that there were jobs that existed in significant numbers in the national economy that the plaintiff could have performed as of 2018. These jobs included three

---

[11] *See, e.g.*, *id.* at 402 (diagnoses of PTSD, OCD, panic disorder, anxiety, and major depressive disorder); 424 (same); *see also id.* at 31 (ALJ's ruling that the plaintiff's PTSD, anxiety disorder, neurocognitive disorder, and depressive disorder were "severe impairments").

[12] *See, e.g.*, *id.* at 402 (describing flashbacks, intense anxiety, intrusive thoughts, verbal outbursts, and depersonalization episodes); *id.* at 332, 402, 422, 548, and 1200 (fatigue).

[13] *Id.* at 28.

[14] *Ibid.*

[15] The ALJ also determined that the plaintiff had the non-severe impairment of mitral valve prolapse, but neither the plaintiff nor the Commissioner suggests this condition caused any significant bothersome symptoms for the plaintiff. *Id.* at 32.

[16] *See generally id.* at 31-39.

3

positions (Hand Packager, Housekeeper, and Small Parts Assembler) that require a "light" level of exertion and two positions (Document Preparer and Final Assembler) that require a "sedentary" level of exertion.[17] The ALJ accordingly determined that the plaintiff was not disabled as of her date last insured.[18]

The plaintiff sought review of the ALJ's decision from the Appeals Council, but her request was denied.[19] She then filed for review in this Court pursuant to 42 U.S.C. § 405(g) and has now moved to reverse or remand the decision of the Commissioner.[20] The Commissioner has cross-moved to affirm.[21]

## DISCUSSION

The Court may "set aside the Commissioner's determination that a claimant is not disabled only if the factual findings are not supported by substantial evidence or if the decision is based on legal error." *Burgess v. Astrue*, 537 F.3d 117, 127 (2d Cir. 2008); *see also* 42 U.S.C. § 405(g). Substantial evidence is "more than a mere scintilla" and "means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Lesterhuis v. Colvin*, 805 F.3d 83, 87 (2d Cir. 2015) (*per curiam*). Absent a legal error, the Court must uphold the Commissioner's decision if it is supported by substantial evidence, even if the Court might have

---

[17] *Id.* at 40-41.
[18] *Id.* at 41.
[19] *Id.* at 5.
[20] Doc. #1 at 1-2; Doc. #21.
[21] Doc. #23.

ruled differently had it considered the matter in the first instance. *See Eastman v. Barnhart*, 241 F. Supp. 2d 160, 168 (D. Conn. 2003).

In determining whether a claimant is disabled, the Social Security Administration engages in a five-step sequential evaluation process, examining:

> "(1) whether the claimant is currently engaged in substantial gainful activity; (2) whether the claimant has a severe impairment or combination of impairments; (3) whether the impairment meets or equals the severity of the specified impairments in the Listing of Impairments; (4) based on a 'residual functional capacity' assessment, whether the claimant can perform any of his or her past relevant work despite the impairment; and (5) whether there are significant numbers of jobs in the national economy that the claimant can perform given the claimant's residual functional capacity, age, education, and work experience."

*Estrella v. Berryhill*, 925 F.3d 90, 94 (2d Cir. 2019); 20 C.F.R. § 404.1520(a)(4). The claimant bears the burden of proving the case at Steps One through Four; the burden shifts at Step Five to the Commissioner to demonstrate that there is other work that the claimant can perform. *See McIntyre v. Colvin*, 758 F.3d 146, 150 (2d Cir. 2014).

The plaintiff argues that the ALJ made two errors in the evaluation process. First, she argues that the ALJ mistakenly determined that her Huntington's Disease was not a severe impairment. Second, she maintains that the ALJ erred in determining her residual functional capacity ("RFC").

### *Severity of Huntington's Disease*

A severe impairment is one that "significantly limits your physical or mental ability to do basic work activities." 20 C.F.R. § 416.920(c); *Woodmancy v. Colvin*, 577 F. App'x 72, 74 (2d Cir. 2014). The regulations in turn define "basic work activities" as "the abilities and aptitudes necessary to do most jobs." 20 C.F.R. § 404.1522(b). Examples of basic work activities include "walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling . . . seeing, hearing, and speaking . . . understanding, carrying out and remembering simple

instructions . . . use of judgment . . . [and] responding appropriately to supervision, co-workers and usual work situations." *Cardoza v. Comm'r of Soc. Sec.*, 353 F. Supp. 3d 267, 279 (S.D.N.Y. 2019).

The ALJ cited much of the evidence discussed above in reaching a conclusion that the plaintiff's Huntington's Disease was not yet a severe impairment by the end of 2018. In particular, the ALJ relied on a psychiatrist's conclusion that the plaintiff did not need Huntington's Disease treatment, the plaintiff's own decision to delay treatment in 2019, and the plaintiff's reports that her symptoms were mild.[22]

This evidence is "more than a mere scintilla," and enough to support the ALJ's conclusion on this point. A decision to delay treatment for a condition is an indication that the condition is not yet debilitating. *Cf. Navan v. Astrue*, 303 Fed. App'x 18, 20 (2d Cir. 2008). Likewise, the plaintiff's contemporaneous evaluations of her symptom severity are highly probative. It is hard to imagine that the plaintiff would describe her Huntington's Disease symptoms as 'mild' and "not bothersome" if they were "significantly limit[ing her] physical or mental ability to do basic work activities."

The plaintiff maintains that the ALJ "clearly did not understand Huntington's Disease at all," and argues that most of the symptoms the ALJ attributed to mental health issues were in fact symptoms of Huntington's Disease.[23] The record belies this claim. The plaintiff's doctors often treated symptoms like irritability, staring spells, attention impairment, and depersonalization as attributable to her mental health conditions.[24] Given this evidence, the ALJ did not have to accept the plaintiff's argument that Huntington's Disease was the root cause of all her symptoms.

---

[22] Doc. #17 at 31-32.
[23] Doc. #21-1 at 24-27.
[24] Doc. #17 at 385-86, 404-06, 680-81, 1071-72

The plaintiff also contends the ALJ should have assigned "significant" or "controlling" weight to the opinions of her therapist (Heidi Outtrim) and HD specialist (Robin Zingales-Browne).[25] But this argument relies on a rule—the treating physician rule—that does not apply to this case. "For claims filed on or after March 27, 2017, the Commissioner 'will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) . . . including those from [a claimant's] medical sources.'" *John K. v. O'Malley*, 2024 WL 1251444, at *5 (D. Conn. 2024) (quoting 20 C.F.R. § 404.1520c(a)). In sum, the ALJ did not err in classifying the plaintiff's Huntington's Disease as a non-severe impairment.

### *Residual functional capacity*

The plaintiff next challenges the ALJ's RFC determination. RFC is "the most the claimant can still do in a work setting despite the limitations imposed by h[er] impairments." *Selian v. Astrue*, 708 F.3d 409, 418 (2d Cir. 2013). In determining RFC, "the ALJ must consider all relevant medical and other evidence in the record." *Tanya Lynn P. v. Kijakazi*, 2021 WL 4726531, at *5 (D. Conn. 2021) (citing 20 C.F.R. § 404.1527(d)(2)); *see also Parker-Grose v. Astrue*, 462 F. App'x 16, 18 (2d Cir. 2012) ("A RFC determination must account for limitations imposed by both severe and nonsevere impairments.").

Among the components of the RFC is a consideration of a claimant's limits in terms of physical exertion. "The Social Security Administration sorts jobs into five physical exertion categories: sedentary, light, medium, heavy, and very heavy." *Poole v. Kijakazi*, 28 F.4th 792, 795 (7th Cir. 2022) (citing 20 C.F.R. § 404.1567).

Here, the ALJ concluded that the plaintiff could perform "a full range of work at all exertional levels," provided that she adhered to the following non-exertional limitations: (1) that

---

[25] Doc. #21-1 at 27-28.

she be limited to simple, routine tasks; (2) that she be limited to a low stress setting; (3) that she not be required to adhere to strict time or production quotas; (4) that she not be required to work with the general public; and (5) that she not be exposed to hazardous machinery or unprotected heights.[26]

The plaintiff argues that the ALJ's decision was not supported by substantial evidence to the extent it concluded that the plaintiff could perform a full range of work at all exertional levels. The term "all exertional levels" is defined to include the performance of even "very heavy work." *Martin v. Saul*, 950 F.3d 369, 375 (7th Cir. 2020); *Romanelli v. Astrue*, 2013 WL 1232341, at *9 n.5 (E.D.N.Y. 2013). "Very heavy work involves lifting objects weighing more than 100 pounds at a time with frequent lifting or carrying of objects weighing 50 pounds or more." 20 C.F.R. § 404.1567(e). Put otherwise, it means being able to "work full-time as a construction worker or a home builder." *Martin*, 950 F.3d at 375.

There is no substantial evidence that the plaintiff could work at all levels of exertion. At a minimum, the ALJ must have accepted to some extent that the plaintiff had anxiety symptoms, sensory overload, irritability, crying spells, problems with handling objects, and balance issues, because she imposed non-exertional limitations on these bases.[27] But a person with this combination of ailments—particularly the two physical limitations considered—is almost certainly not able to meet the exertional demands required to meet the regulatory definition of "very heavy work."

Perhaps more importantly, the ALJ overlooked evidence in the record that was particularly probative to exertional limitations. As the plaintiff points out, her cardiologist

---

[26] Doc. #17 at 34.
[27] *Id.* at 38-39.

indicated that she had "dyspnea"—labored breathing—on exertion.[28] Moreover, the record is filled with other references to marked fatigue.[29] This evidence is relevant to the exertional assessment the ALJ rendered, but there is no indication that it was considered. *See Tanya Lynn P.*, 2021 WL 4726531, at *5 (ALJs must consider "all relevant medical and other evidence in the record").[30]

At oral argument, the Commissioner argued that the ALJ could have relied on other parts of the record to discount this evidence of exertional limitations. But while not "'every conflict in a record [need] be reconciled by the ALJ or the Secretary, . . . [reviewing courts] do require that the crucial factors in any determination . . . be set forth with sufficient specificity to enable [the court] to decide whether the determination is supported by substantial evidence.'" *Estrella*, 925 F.3d at 95 (2d Cir. 2019) (quoting *Ferraris v. Heckler*, 728 F.2d 582, 587 (2d Cir. 1984)).

Here, the ALJ did not explain how she arrived at the conclusion that the plaintiff could have worked at "all exertional levels," which includes heavy and very heavy work such as jobs performed by construction workers or home builders. The ALJ listed a variety of reasons why she was "not persuaded that the degree of impairment rendered [the plaintiff] disabled during the relevant time period."[31] But little of that evidence spoke specifically to the plaintiff's exertional capacity, and the link between the evidence and the exertional capacity determination was not readily apparent. Thus, I agree with the plaintiff that the ALJ's "all exertional levels" determination was not supported by substantial evidence.

---

[28] *See, e.g.*, *id.* at 331, 363, 479, 481, 484, 580.

[29] *See, e.g.*, *id.* at 361, 402, 422, 548, 1200.

[30] The ALJ's ruling states that the ALJ considered "all [the plaintiff's] symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence." But I am hesitant to accept this boilerplate declaration when the ALJ's analysis leaves out clearly relevant evidence. *See, e.g.*, *Ayaz M. v. Kijakazi*, 2024 WL 449575, at *3 n.6 (D. Conn. 2024); *Grant v. Saul*, 2020 WL 1307106, at *7 (D. Conn. 2020).

[31] Doc. #17 at 38.

On the other hand, I do not agree with plaintiff's further argument that the ALJ failed to incorporate into the RFC her difficulties with staying on task. The ALJ explicitly considered the plaintiff's claims that "[s]he stopped sending emails because she was unable to focus and sit still," "had problems with executive functioning," was "unable to complete a shopping list" because "she became very overwhelmed at the grocery store and often forgot items," and that her "anxiety was so severe that she could not do things with her own children."[32] The ALJ simply found other parts of the record more persuasive, such as evidence that, as of 2020, the plaintiff "cared for her sons while her husband worked part-time, prepared meals daily, and performed all household chores such as dishes and laundry . . . had no problems with personal care and . . . drove short distances."[33] Given that the record indeed contains substantial evidence on this point, I find no error in the ALJ's conclusion with respect to the plaintiff's staying on task.

### Harmless error

In view that the ALJ erred in concluding that the plaintiff could perform work at all exertional levels, the question remains whether this error was harmless. At oral argument, the Commissioner argued that any error by the ALJ with respect to the RFC determination was harmless in light of the ALJ's additional determination at Step Five of the analysis that the plaintiff could perform several jobs that were available in the national economy and that required only sedentary or light levels of exertion.[34]

---

[32] *Id.* at 35.

[33] *Id.* at 38; *see also id.* at 237-240.

[34] "Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools," and "[a]lthough a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties." 20 C.F.R. § 404.1567(a). The term "'sedentary work' is generally defined as work in a sitting position for six hours of an eight-hour workday." *McIntyre*, 758 F.3d at 152. Light work is more demanding than sedentary work. It requires lifting no more than twenty pounds at a time, with "frequent lifting or carrying of objects" weighing no more than ten pounds. 20 C.F.R. § 404.1567(b). When someone is capable of light work, there is a default determination that they can also do sedentary work, "unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time." *Id.*

Before I address this argument, I take note of the demanding standard of harmless error review that applies when an administrative agency makes an erroneous finding of fact. As the Supreme Court has instructed, "'a judicial judgment cannot be made to do service for an administrative judgment.'" *Lin v. U.S. Dep't of Justice*, 453 F.3d 99, 106 (2d Cir. 2006) (quoting *SEC v. Chenery Corp.*, 318 U.S. 80, 88 (1943)). It is not for courts to fill in the gaps or usurp the role of the administrative agency to make factual findings in the first place.

Therefore, if an ALJ makes an erroneous finding of fact, a reviewing court must consider if the record is so one-sided with respect to the fact that a "remand would be pointless." *Id.* at 107. Put differently, a remand is required for the ALJ to reconsider the factual issue unless "there is no realistic possibility that, absent the errors, the [administrative agency] would have reached a different conclusion." *Alam v. Gonzales*, 438 F.3d 184, 187 (2d Cir. 2006); *see also Zabala v. Astrue*, 595 F.3d 402, 409 (2d Cir. 2010) (explaining that remand for reconsideration of a factual record is unnecessary "where application of the correct legal principles to the record could lead only to the same conclusion"); *Spiva v. Astrue*, 628 F.3d 346, 353 (7th Cir. 2010) (Posner, J.) (rejecting argument that a reviewing court need only "find enough evidence in the record to establish that the administrative law judge *might* have reached the same result had she considered all the evidence" and concluding that error is harmless only "[i]f it is predictable with great confidence that the agency will reinstate its decision on remand because the decision is overwhelmingly supported by the record though the agency's original opinion failed to marshal that support," such that "remanding is a waste of time").

In light of this demanding standard, I am not convinced that the ALJ's analysis at Step Five rendered harmless the ALJ's error with respect to assessing the plaintiff's RFC. To the contrary, the ALJ's Step Five analysis doubled down at the outset on the ALJ's RFC error that

11

the plaintiff had an "ability to perform work at all exertional levels."[35] Only then did the ALJ go on to conclude that the plaintiff could perform several jobs which were described in incidental terms as requiring only sedentary or light levels of exertion. The ALJ did not conduct any analysis at Step Five of how the plaintiff's physical abilities allowed her to perform sedentary or light work.

That is not surprising because Step Five of the disability analysis is not focused on a claimant's exertional capacities. Step Five is focused on the existence of jobs that are within the exertional capacities that have been previously found by the ALJ as part of the RFC determination. An ALJ is required to make a reasoned determination of exertional capacity in the first instance when formulating the RFC, and it would defeat the purpose of the structured five-step inquiry to allow an ALJ—without explanation—to implicitly revise the RFC assessment of a claimant's exertional capacity at Step Five when deciding what jobs a claimant can perform. As the Seventh Circuit has explained, "[t]he ALJ's choice of exertional level is among the most important aspects of the RFC," and courts are not at liberty to "rewrite the record as though the ALJ's central factual finding was a typo." *Poole*, 28 F.4th at 797.

So the ALJ's Step Five determination in this case begs the question whether the plaintiff could perform at a sedentary or light level of exertional capacity. On this factual question the evidence is mixed. On one hand, various medical records from 2018 describe the plaintiff as being "fatigued throughout the day" and "chronic[ally] fatigue[d]."[36] Another medical record from April 2018 reflects that the plaintiff had "some element of fatigue and exertional dyspnea,"

---

[35] Doc. #17 at 40.
[36] *See, e.g.*, *id.* at 361, 402, 479.

and the plaintiff's "sense of weakness ascending from both of her legs into her [en]tire torso where she was unable to speak."[37]

In addition, she testified at the hearing that there was "no way" she could work 40 hours per week.[38] As the ALJ noted, the plaintiff testified that "[s]he was losing balance frequently, including walking into walls," and "[s]tiffening of her limbs made it hard to walk and she fell frequently."[39] The ALJ chose to add a "hazards" limitation to the RFC because of "the claimant's reported symptoms of dropping things frequently and balance problems."[40]

On the other hand, some medical records indicate that the plaintiff was able to perform the activities of daily living and that she "force[d] herself to do all of her chores and take care of her kids" notwithstanding her lack of energy.[41] The plaintiff also noted herself that she spends "lot[s] of time walking with her children," and that she prepares three meals per day.[42]

Apart from this mix of evidence, the ALJ's decision itself casts additional doubt on whether the plaintiff was capable of even sedentary work. The ALJ concluded at Step Four of the analysis that the plaintiff could not perform her past employment as an accounting clerk, a position that the ALJ determined required only a sedentary level of exertion.[43] The evidence before the ALJ was that the plaintiff's prior employment allowed her to sit at least 90% of the time and that the plaintiff engaged in "very little" lifting and carrying.[44] Nevertheless, the ALJ concluded on the basis of *both* "the physical and mental demands" of this past employment that the plaintiff could not return to it.[45] The fact that the ALJ concluded—at least in part because of

---

[37] *Id.* at 331.
[38] *Id.* at 83.
[39] *Id.* at 34-35.
[40] *Id.* at 39.
[41] *Id.* at 422, 450.
[42] *Id.* at 237, 331.
[43] *Id.* at 39.
[44] *Id.* at 90-92.
[45] *Id.* at 39 ("In comparing the claimant's residual functional capacity with the physical and mental demands of this

the prior job's "physical" demands—that the plaintiff could not perform her past sedentary employment raises additional uncertainty about whether the plaintiff was capable of the sedentary or light work required for the job positions that the ALJ decided were available in suitable numbers in the national economy.

All in all, I am not convinced that the ALJ's error with respect to the plaintiff's RFC formulation was harmless. Again, my task is not to speculate about what the ALJ might or could have found. Rather, my task is to decide if the evidence on the plaintiff's exertional abilities is so one-sided that a remand would be altogether pointless. It would not. And "it is for the Social Security Administration, not this Court, to weigh conflicting evidence in the first instance." *Williams v. Astrue*, 2012 WL 3096694, at *1 (E.D.N.Y. 2012).[46]

### CONCLUSION

For the reasons set forth above, the Court GRANTS the plaintiff's motion to remand (Doc. #21). The Court DENIES the Commissioner's cross-motion to affirm (Doc. #23). The Clerk of the Court shall close this case.

It is so ordered.

---

work, the undersigned finds that the claimant is not able to perform it as actually and generally performed.").

[46] Other harmless error decisions in the social security disability context are distinguishable. In *Akey v. Astrue*, 467 F. App'x 15 (2d Cir. 2012), the ALJ concluded that the claimant "was intellectually capable of performing unskilled and semi-skilled work," and the court of appeals found substantial evidence to support this determination. *Id.* at 17. The court of appeals further found that "[t]he ALJ's failure to include the limitation to unskilled and semi-skilled work is harmless because the only jobs the vocational expert identified were unskilled or semi-skilled." *Ibid.* That decision is distinguishable because, unlike this case, it did not involve any initial error with respect to the ALJ's formulation of an RFC, and the only error was with respect to the ALJ's formulation of an incomplete question to the vocational expert. Similarly, in *Walsh v. Colvin*, 2016 WL 1626817 (D. Conn. 2016), the ALJ erred with respect to an RFC formulation that the claimant could "carry out moderately complex instructions," and I found that this error was harmless in light of the ALJ's subsequent determination at Step Five that the claimant could perform "jobs that only required following, remembering, and carrying out simple instructions." *Id.* at *6-7. But there was no underlying dispute or uncertainty in *Walsh* about the claimant's baseline ability to carry out simple instructions; indeed, the ALJ expressly found without contradiction as part of the RFC determination that the claimant "could 'understand, remember, and carry out simple instructions throughout an ordinary workday and workweek with normal breaks on a sustained basis.'" *Id.* at *5. Here, by contrast, there is uncertainty about the plaintiff's ability to perform even sedentary or light work.

Dated at New Haven this 5th day of September 2024.

/s/ *Jeffrey Alker Meyer*
Jeffrey Alker Meyer
United States District Judge